892 F.2d 79
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Emma L. HAWKINS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 89-1438.
 United States Court of Appeals, Sixth Circuit.
 Dec. 18, 1989.
 
 Before NATHANIEL R. JONES and MILBURN, Circuit Judges and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Emma Hawkins appeals the district court's grant of summary judgment denying her disability insurance benefits and supplemental security income ("SSI") on the basis that substantial evidence supported the finding of the Secretary of Health and Human Services ("Secretary") that Hawkins was not disabled. For the reasons that follow, we affirm.
 
 I.
 
 2
 Emma Hawkins was born June 23, 1935. She attended school through the ninth grade and obtained a G.E.D. in March 1982. Her past relevant work was as a grocery store cashier, and she was last employed June 15, 1980, at which time she was dismissed because of excessive absenteeism.
 
 
 3
 Hawkins applied for disability insurance and SSI benefits on July 30, 1985, claiming numerous health problems. Her claim was denied both initially and upon reconsideration. Hawkins requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on June 24, 1986.
 
 
 4
 At the hearing, Hawkins testified that severe headaches incapacitated her two days per week. She had been diagnosed as experiencing "chronic maxillary sinusitis." The diagnosis was apparently based on an X-ray of the sinuses which indicated "some thickening of the mucosal along the lateral wall of the left maxillary antrum, most likely due to chronic maxillary sinusitis." A medical adviser testified at the hearing that sinusitis "can" cause headaches such as Hawkins complained of. However, Hawkins' extensive medical record showed no past complaints of headache.
 
 
 5
 Hawkins also testified of back pain which confined her to bed five days a week. Hawkins was hospitalized for back pain in 1981 and treated by Dr. Rivera. The diagnosis was acute low back strain, but she was discharged with no restrictions on her activities.
 
 
 6
 The deposition of Dr. Raymond Weitzman, a physician who had been treating Hawkins for back and knee pain, was offered for his opinion that Hawkins could not sit/stand six hours of an eight-hour day. His deposition shows that his opinion was based upon an assumption that Hawkins would be rigidly confined to sitting or standing.
 
 
 7
 Dr. Weitzman testified that his diagnosis and opinion were based upon X-rays, an electromyogram ("EMG") and clinical examinations. Dr. Weitzman promised to submit X-rays to the Secretary to support his findings, but the Secretary never received them. The only EMG results in the record were essentially normal. Dr. Weitzman found that Hawkins had severe limitation of movement in her left knee and moderate limitation of movement in her back. However, Dr. Rivera reported that Hawkins had no limitation of motion in her knees. And Dr. Sabbota (who was treating Hawkins for chest pain) observed, as of January 8, 1986, "There has been no restriction of movement at the current time of her back."
 
 
 8
 Hawkins testified at the hearing that she suffered from chest pains, shortness of breath, and palpitations. In 1982, Dr. Sabbota gave Hawkins a gastrointestinal, treadmill test, cardiac catherization, and an EKG. All these tests were essentially normal. In 1985, a Thallium stress test indicated some abnormal findings over the septum which were said to be consistent with her complaint of chest pain. Dr. Sabbota diagnosed vasospasm, and, in a letter dated January 9, 1986, he noted that with medication Hawkins "appears to be doing well until emotionally excited." He also noted that nitroglycerin was effective to discontinue her chest pain within a matter of minutes.
 
 
 9
 A medical adviser explained at the hearing that vasospasm means that blood vessels go into spasms which operate to deprive some body parts of blood. On cross-examination, he admitted that such a diagnosis "could" account for Hawkins' complaints of chest pain.
 
 
 10
 Hawkins testified that she experienced a "blistering" condition of the hands which caused them to itch and burn. She said that her fingernails emitted extreme pain anytime she touched them to a hard object. She was treated for this condition by a Dr. Simmons. Dr. Simmons diagnosed psoriasis of the fingernails. He reported that Hawkins' "only functional limitations might be fine motor movement in the involved fingers."
 
 
 11
 Hawkins also said that she experienced pain in her feet. She underwent bone and soft tissue surgery in March 1977 to remedy "joint bunions" and "joint deformities." She was expressly granted permission to return to work without restriction. Later examinations revealed no bone spurs or circulatory problems.
 
 
 12
 Hawkins also complained of "bladder problems" causing frequent urination and false urges to urinate. Hawkins had been treated in the past for chronic cystitis (an inflammation of the bladder) and a "recurrent urinary tract infection." Numerous tests had revealed no abnormalities in the urinary tract other than infection and inflammation.
 
 
 13
 Hawkins testified before the ALJ of a hearing loss in her left ear that forced her to use her right ear when talking on the telephone. An audiogram confirmed that she had no measurable hearing in her left ear.
 
 
 14
 The ALJ found that Hawkins' testimony as to various impairments which severely restricted her functional capacity was not credible or consistent with the medical evidence. He observed that
 
 
 15
 claimant showed no signs of pain or physical abnormalities at the time of the hearing. She was able to concentrate well and respond to questioning appropriately. In addition, the claimant seemed to greatly exaggerate her limitations at the time of the hearing, stating that she stays in bed almost all day and does little, if anything at all. Nonetheless, in a report of contact with the claimant in August, 1985, the claimant stated that she engages in a lot of activities with her church, fixes dinner, does laundry, does some dusting, and does some grocery shopping.
 
 
 16
 J.A. 20.
 
 
 17
 Accordingly, the ALJ called upon a vocational expert ("VE") to answer the following hypothetical question:
 
 
 18
 Consider [Hawkins'] age was 51 years of age. Her education which is high school and above by Social Security standards. Her past work was a cashier, which is semi-skilled work, range in the medium level. Her impairments by documentation is acute low back pain, rhinitis, a history of bladder problems including recurrent urinary tract infections, some chest pain. Her treadmill test with respect to physical capacity was a normal treadmill test. Assume she can sit/stand six of eight hours. Lift a maximum of twenty pounds frequently. She does not need any aids for walking, such as a cane or crutch. She is restricted from prolonged use of the hands in water, and some fine, diminished manipulation of the fingers involved in psoriasis. She has some diminished hearing loss ... [o]n the left side. She is able to hear normal conversation. She does not wear a hearing aid. On the basis of those factors, are there any jobs that exist in the national economy which she can perform?
 
 
 19
 J.A. 95-96.
 
 
 20
 The VE testified that Hawkins had acquired skills as a grocery cashier which would still allow her to do a significant number of light exertional-level jobs. According to the VE, in the State of Michigan there were 32,000 jobs for cashiers, 1,500 informational clerks, and 22,000 stock and inventory positions for which Hawkins was qualified. However, the VE admitted during cross-examination that if Hawkins' limitations were as severe as she claimed, they would prevent her from holding gainful employment.
 
 
 21
 Following the five-step sequential evaluation prescribed in 20 C.F.R. Part 404.1520(a)--(f), the ALJ reached the fifth step to find that Hawkins was not disabled because she retained the residual functional capacity to perform jobs which existed in significant numbers in the national economy. Thus, the ALJ denied Hawkins' claim.
 
 
 22
 Hawkins' request for review by the Appeals Council was denied, and she commenced a civil action in the district court. Despite a magistrate's recommendation that the decision of the Secretary be affirmed, the district court remanded the matter to the Secretary "for further clarification of the basis for the decision that plaintiff did not have severe disabling headaches due to sinusitis and the decision that she had the ability to sit and stand for six of eight hours."
 
 
 23
 On remand, a second ALJ clarified the findings of the first. Concerning the headaches, the second ALJ found a lack of proof that sinusitis caused the alleged headaches and a lack of credibility on the part of Hawkins. The second ALJ identified specific reasons for rejecting Dr. Weitzman's opinion that Hawkins could not sit/stand for six of eight hours. EMGs and X-rays which Dr. Weitzman purportedly relied upon were not present in the record to support his opinion. Dr. Weitzman found much more limitation of movement than other treating physicians, and he based his opinion upon a mistaken assumption that a job would require Hawkins to be rigidly confined for a "defined" period of time.
 
 
 24
 After the Appeals Council adopted the findings and conclusions of the ALJ, the action was reinstated on the district court's docket. The parties filed cross-motions for summary judgment, and the court referred the matter to a magistrate. The magistrate recommended summary judgment in favor of the Secretary, and the district court adopted the magistrate's report and recommendation. This timely appeal followed.
 
 
 25
 The issues presented in this appeal are whether the Secretary had substantial evidence for finding: (1) that Hawkins was not disabled by severe headaches, (2) that Hawkins could sit/stand for six hours of an eight-hour day, and (3) that Hawkins could perform work which existed in significant numbers in the national economy despite the combined effects of her impairments.
 
 II.
 A.
 
 26
 In this case, our scope of review is limited to the inquiry of whether the Secretary's findings were supported by "substantial evidence." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). In reviewing for substantial evidence, we must examine the record taken as a whole. Duncan v. Secretary of Health & Human Services, 801 F.2d 847, 852 (6th Cir.1986). The fact that the record contains substantial evidence to support a conclusion contrary to that reached by the Secretary is irrelevant even if we would have decided the case differently. Crisp v. Secretary of Health & Human Services, 790 F.2d 450, 453 n. 4 (6th Cir.1986) (per curiam).
 
 B.
 
 27
 Hawkins argues that she experienced disabling sinusitis-induced headaches. In his discussion of Hawkins' alleged headache pain, the second ALJ stated:
 
 
 28
 The undersigned can only concur that [Hawkins'] credibility, being questionable, cannot be accepted as the sole factor upon which to base a finding of debilitation without objective medical evidence in support. Therefore, the undersigned concludes that claimant's headaches are not a totally debilitating factor.
 
 
 29
 J.A. 424.
 
 
 30
 We require that subjective allegations of pain be corroborated with objective evidence of an underlying medical condition. Duncan v. Secretary of Health & Human Services, 801 F.2d 847, 853 (6th Cir.1986). Though there is objective evidence in the record to support a diagnosis of sinusitis and rhinitis, there is also substantial evidence in the record to support a finding that sinusitis and rhinitis did not cause severe disabling headaches. See 20 C.F.R. § 404.1529 (1988) (requiring "a medically determinable impairment which can be shown to be the cause of the symptom.") (emphasis added) (cited approvingly in McCormick v. Secretary of Health & Human Services, 861 F.2d 998, 1003 (6th Cir.1988)).
 
 
 31
 The only evidence in the record to link sinusitis with Hawkins' alleged headaches was the admission of the medical expert that "sinus inflamed or obstructed sinuses can be responsible for headaches." The expert's testimony at most establishes a possibility rather than a probability of a causative link. The record shows that Hawkins was treated for a variety of physical ailments since 1977 with "precious little mention of headaches." Moreover, as noted by the first ALJ, the record indicates that Hawkins exaggerated her limitations when she testified. Thus, we find substantial evidence to support the ALJ's conclusion that Hawkins did not experience disabling sinus-induced headaches.
 
 
 32
 Turning to Hawkins' arguments that she was totally disabled because of her back pain, we note that the determination of disability rests with the Secretary and not with the conclusory statements of treating physicians. King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984). "This determination obviously involves consideration of many factors, only one of which is medical impairment...." Id. Normally, substantial deference must be given to the opinions of treating physicians. Id. However, the Secretary is not bound to accept a treating physician's opinion if he can identify good reason for rejecting it. See id.
 
 
 33
 The second ALJ identified legitimate reasons for rejecting Dr. Weitzman's opinion that back pain prevented Hawkins from sitting/standing six of eight hours. The X-rays that Dr. Weitzman supposedly relied upon were never made part of the record. Dr. Weitzman supposedly relied upon EMGs to support his opinion, but the only evidence of EMGs in the record came from Dr. Sabbota and showed normal EMGs.[1]
 
 
 34
 Dr. Weitzman found that Hawkins had severe limitation of movement in her left knee and moderate limitation of movement in her back. However, Dr. Rivera and Dr. Sabbota made contrary findings.
 
 
 35
 Furthermore, as the ALJ pointed out, Dr. Weitzman's opinion was based upon the incorrect assumption that Hawkins would be forced to sit/stand for a "defined" period of time. We hold that the above factors identified by the second ALJ constitute substantial evidence to support his rejection of Dr. Weitzman's opinion.
 
 
 36
 Hawkins next argues that the ALJ failed to consider the combined impact of all her impairments. When the ALJ found that Hawkins was unable to perform her past relevant work, the burden shifted to the Secretary to prove that work existed in the national economy which Hawkins could perform. E.g., Kirk v. Secretary of Health & Human Services, 667 F.2d 524, 529 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983). The Secretary may carry this burden by reliance upon the answer of a vocational expert to a "hypothetical question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.' " Varley v. Secretary of Health & Human Services, 820 F.2d 777, 779 (6th Cir.1987) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984)). The "hypothetical" need not be couched in the claimant's chosen words if it "fairly takes into account" the claimant's limitations and if the factual assumptions underlying the hypothetical are supported by substantial evidence. Id. at 780.
 
 
 37
 The foregoing analysis has demonstrated that substantial evidence supported the factual assumptions that Hawkins could sit/stand six hours of an eight-hour day and that Hawkins did not suffer disabling sinus headaches. Hawkins argues that the hypothetical should have assumed that her cardiac condition prevented her from lifting twenty pounds frequently, that pain from the dermatological impairments in her hands hampered her ability to work, that she suffered pain in her feet, and that she was hampered by a frequent urge to urinate.
 
 
 38
 Having carefully reviewed the record, we believe that substantial evidence supports the ALJ's finding that Hawkins greatly exaggerated her own limitations. Thus, the ALJ was justified in excluding from the hypothetical alleged impairments not proven by objective medical evidence. Since the ALJ based his decision that Hawkins was not disabled upon the answer to a hypothetical question which "fairly took into account" all the physical impairments proven by objective medical evidence, we hold that the ALJ considered the combined impact of Hawkins' impairments.
 
 III.
 
 39
 Accordingly, for the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The ALJ also spoke of a negative myelogram. Hawkins points out that there is no evidence in the record of a negative myelogram. However, if the ALJ did mistakenly point to a negative myelogram, the mistake was harmless error. The ALJ discussed myelograms only to show that Dr. Weitzman had no "X-rays, EMGs, and myelograms" to support his opinion as to Hawkins' physical disabilities